## CHI-SANG POON *vs.* MASSACHUSETTS INSTITUTE OF TECHNOLOGY & another.[1]

No. 06-P-1993.

Middlesex. March 11, 2008. - May 6, 2009.

Present: DUFFLY, VUONO, & SIKORA, JJ.

*Anti-Discrimination Law,* Employment, Race. *Employment,* Discrimination, Retaliation. *Practice, Civil,* Summary judgment.

Discussion of the standard of review applicable to the allowance of a motion for summary judgment in a civil action alleging employment discrimination. [194-195]

In a civil action alleging racial discrimination in employment, the employee failed to show any reasonable prospect of proof at trial that the reasons given for the employer's decision not to promote him were a pretext, and failed to generate a genuine issue of material fact of pretext [195-199]; further, the employee had no reasonable expectation of proof that any of the identified incidents after he filed a letter of complaint qualified as retaliation [199-201].

CIVIL ACTION commenced in the Superior Court Department on July 9, 2004.

The case was heard by *Nonnie S. Burnes,* J., on a motion for summary judgment.

*Jonathan Shapiro* for the plaintiff.

*Jeffrey Swope* (*Robert G. Young* with him) for the defendants.

SIKORA, J. This appeal requires review of a summary judgment disposition of claims of employment discrimination and retaliation brought under G. L. c. 151B, § 4. The plaintiff employee Chi-Sang Poon, Ph.D. (Dr. Poon), is a scientist concentrating in the field of bioengineering. The defendant Massachusetts Institute of Technology (MIT) has been his employer for almost twenty years and the defendant Martha L. Gray, Ph.D. (Professor Gray), a member of the university faculty, has been a supervisor of Dr. Poon's work for the past twelve years.

---

[1]Martha L. Gray.

*Background.* 1. *Procedural history.* In November, 2001, Dr. Poon lodged his original charges with the Massachusetts Commission Against Discrimination (MCAD). He alleged that MIT and Professor Gray had effectively denied him promotion from the position of principal research scientist (PRS) to the position of senior research scientist (SRS) in 1993, 1997, and 2001, by reason of his race (Asian) and national origin (Chinese), and that the defendants had subsequently retaliated against him for his complaints of discriminatory treatment in May and November, 2001. After investigation, the MCAD in May, 2004, found the claim of discriminatory nonpromotion in 1993 to be untimely and the claims of similar treatment in 1997 and 2001 and of retaliation after May, 2001, to lack the support of probable cause. It dismissed them.

In July, 2004, Dr. Poon brought the present action in the Superior Court upon the same claims of discrimination (count one) and retaliation (count two) in violation of G. L. c. 151B, § 4. Extensive discovery results and verified information had accumulated in the MCAD and continued to accrue in the Superior Court in the form of answers to interrogatories, the production of documents, deposition testimony, and affidavit statements and exhibits. At the conclusion of discovery, MIT and Professor Gray moved for full summary judgment. They supported the motion with an itemized statement of undisputed facts and legal elements in accordance with Superior Court Rule 9A(b)(5).[2] Pursuant to that rule, Dr. Poon responded to the defendants' statements of facts and legal elements. After consideration of the voluminous record, memoranda of law, and oral argument,

---

[2]In pertinent part, that rule directs the parties contesting a summary judgment motion to come to grips with the material facts of each claim or cause of action as specifically as possible by the following process.

"Each motion for summary judgment shall be accompanied by a concise statement, in consecutive numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried, with page or paragraph references to supporting pleadings, depositions, answers to interrogatories, admissions and affidavits, and a statement of the legal elements, with citations to supporting law, of each claim upon which summary judgment is sought. Failure to include the foregoing statements shall constitute grounds for denial of the motion.

"Each opposition to a motion for summary judgment shall include a

in September of 2006, a judge of the Superior Court concluded in a thirty-four page memorandum of decision that the claim of discrimination in 1993 had become time barred and that the factual materials relating to the claims of discrimination in 1997 and 2001, and to the claim of retaliation after May, 2001, did not permit any reasonable expectation of proof at trial. She entered full summary judgment. Dr. Poon has appealed from the portion of the judgment disposing of the claims rooted in the events of 1997 onward.[3]

2. *Facts.* The following information emerges from the summary judgment record as undisputed. Dr. Poon was born and raised in Hong Kong. He earned a bachelor's and a master's degree in electrical sciences from universities in that city and then a Ph.D. in systems science and bioengineering from the University of California, Los Angeles. From 1981 until 1988, he held junior faculty positions at North Dakota State University and began research in bioengineering subjects, particularly cardiovascular and respiratory functions. In 1988, he came to MIT as a visiting scientist in the Harvard-MIT Division of Health Sciences and Technology (HST).

HST is a multidisciplinary division, and not an academic department, of those universities. It engages in bioengineering

response, using the same paragraph numbers, to the moving party's statement of facts as to which the moving party claims there is no genuine issue to be tried, in consecutive numbered paragraphs, a concise statement of any additional material facts as to which the opposing party contends there is a genuine issue to be tried, with page or paragraph references to supporting pleadings, depositions, answers to interrogatories, admissions and affidavits, and in the event the opposing party disagrees with the moving party's statement of the elements of the claims as to which summary judgment is sought, a statement of the legal elements, with citations to supporting law, of each claim upon which summary judgment is opposed."

Noncompliance by a responding party will expose it to the risk of critical admissions.

"For purposes of the motion for summary judgment, facts contained in a statement described in the first paragraph hereof shall be deemed to have been admitted unless controverted in the manner set forth in the second paragraph hereof."

[3]He does not appeal from the determination of the untimeliness of the claim of discriminatory denial of promotion in 1993.

research strengthened by the human and technological resources available from the schools of general science, engineering, and medicine at each institution. Two codirectors serve as its chief officers. It enjoys access to approximately 200 faculty professors. HST maintains a staff of ten nonfaculty, nontenure track, MIT-employed research scientists. Those individuals fall into three ranks arranged in ascending order and title as research scientist (RS), principal research scientist (PRS), and senior research scientist (SRS). These ranks appear available across a number of MIT departments, divisions, and units, and not merely in the HST. In 1989, Dr. Poon received appointment as a PRS. Under MIT's published policies and procedures, both SRS and PRS appointees enjoy indefinite duration but remain subject to quadrennial review and to periodic review by an appropriate supervisor (one of the two codirectors of HST) for determination of the continuance of the appointment in light of the quality of the individual's work and the need for his or her services.

At all relevant times, the published qualifications for the rank of PRS have been the demonstrated ability "to generate and develop concepts independently and to conduct independent research" and the capacity for "unique scholarly or other technical contributions to research projects."

The published qualifications for the higher rank of SRS have included the following.

> "Individuals holding [an SRS] appointment conduct independent investigations, with the ability to direct the work of others. They possess a demonstrated research competence equal to that of a tenured faculty member. Appointment or promotion to this rank is evidence of wide external and internal recognition of independent contribution to research in the individual's field. Such contributions may be illustrated by traditional scholarly recognition, excellence in the leadership of technical projects, or other significant research impact."

In effect, MIT policies and procedures require from the SRS both the ability for independent research and the capacity for direction and leadership of other scientists.[4]

---

[4]In addition, MIT restricts the number of SRS level appointments to ten

a. *Events of 1997.*[5] In February of 1997, Professor Gray, as codirector of HST, received a document entitled "Guidelines for the Review of Principal Research Scientists and Research Scientists" (guidelines) from the MIT vice-president and dean of research. The guidelines became effective on March 1, 1997, and required a four-year review of the performance of each PRS individual by a committee of three (two faculty and one researcher) appointed by an HST director. The committee was to evaluate the quality, funding, and future of the PRS's research and educational contributions, and to submit a report to the HST codirectors. It was to solicit at least seven letters of assessment from recognized experts in the individual's field at MIT; and six or more letters from comparable experts outside MIT. The HST head would, in turn, generate a recommendation about the PRS upward to the vice-president of research, and would provide the PRS with a formal written assessment of standing and of the probability for advancement.

During the period of January 31 into April, 1997, Professor Gray drafted documents in preparation for an assessment of Dr. Poon's performance, including a request that he furnish a statement of career goals, a list of individuals within and beyond MIT capable of evaluation of him, and copies of five of his most recent and significant papers.

On April 8, she forwarded a memorandum to the members of the HST personnel committee placing the subject of Dr. Poon's four-year evaluation under the new guidelines on the agenda of an April 11 meeting. At that meeting the members addressed the subject of evaluation of Dr. Poon and a second HST member. The record of the agenda indicates without elaboration that they

percent of its aggregate tenured faculty or twenty percent of the tenured faculty within the department or unit in question. MIT Policies and Procedures § 5.3.1 (1997).

[5] Dr. Poon, in the MCAD and in the Superior Court, alleged that in 1993 MIT had discriminatorily denied him promotion to the position of SRS. By deposition he testified that he viewed a request by the then codirector of HST (a predecessor of Professor Gray) for submission of his updated curriculum vitae and credentials as the first step of a process of consideration for promotion. However, nothing in the summary judgment record indicates that the 1993 events constituted a promotional process rather than a regular quadrennial personnel review. In all events, Dr. Poon no longer appeals from the motion judge's disposition of the 1993 claim as untimely.

did not vote to go forward with the evaluation of Dr. Poon. By deposition Professor Gray testified that the personnel committee discontinued the evaluation because the members anticipated negative assessment letters potentially harmful to Dr. Poon's long-term career prospects. By answers to interrogatories, Professor Gray reported that such "letters likely would not have reflected well upon his interpersonal abilities and therefore could have undermined his future academic career." She did not inform him of the aborted evaluation. Professor Gray regarded the 1997 process as an exercise of personnel review. None of the documents from Professor Gray to Dr. Poon used the word promotion.

Dr. Poon viewed it as an application for promotion to SRS rank. By deposition he testified that, several months after the submission of his papers, Professor Gray had told him that she had been too busy to complete the process.

b. *Events of 2001.* In May of 2001, Dr. Poon wrote to Professor Gray to request prompt consideration of his promotion to SRS. On July 12, 2001, Professor Gray informed him by letter that an internal review by the HST personnel committee in 1997 "did not result in a sufficient mandate to warrant proceeding with consideration of your promotion," but that the committee would now be willing to entertain his candidacy for promotion. Dr. Poon submitted updated materials of his performance.

At a meeting on November 27, 2001, the committee[6] adopted a policy statement of qualifications for SRS rank, including the following language.

> "With regard to the individual's role in the Division [the HST unit], a candidate should be well-integrated into the fabric of the Division and should play a vital, leadership role in the overall program. In fact, the Institute policy states that the individual should have 'the ability to direct the work of others.' It was the sense of the meeting that HST Senior Research Scientist appointments should be awarded only to individuals who bring major programmatic leadership that advances the collegial, interdisciplinary goals of the Division. Again, it was pointed out that the numeric limitation by the Institute is meant to recognize

[6]Eleven of the thirteen members were present.

world-class scientific stature as well as leadership; i.e., such appointments are to be given only to stellar individuals whom the Division would like to keep."

The committee then considered the application of Dr. Poon as "measured against [the] policy," received the recommendations of the two HST codirectors against promotion, and after further discussion "unanimously supported the position that there is not compelling basis to move the appointment forward." The committee did not place a record of this action in Dr. Poon's personnel file or inform him of it at that time.

c. *Events related to the claim of retaliation.* In the course of his letter of May 9, 2001, to Professor Gray requesting promotion to SRS rank, Dr. Poon suggested that his "Asian descent" was causing, or contributing to the cause of, his lack of promotion. Professor Gray rejected the suggestion in her letter of July 12, 2001. Dr. Poon attributes four subsequent events to retaliation against his allegations of discrimination.

On July 13, 2001, Professor Gray informed him of a plan to move his office to an alternate building with a resulting loss of space and a reassignment of his secretary. When Dr. Poon objected and suggested the action to be retaliatory, Professor Gray responded that the plan had formed before his complaint and had sought to satisfy his desire for office space closer to his laboratory space. She withdrew the changes.

In August, 2001, Dr. Poon requested MIT to appeal from the denial by the National Science Foundation (NSF) of a grant application submitted by him earlier that year. He prepared a letter of appeal to a superior officer at NSF and requested HST's endorsement of it. After discussion of the NSF process, Dr. Poon closed with the following paragraph.

> "We cannot speculate on the motive behind the program director's [the NSF official originally denying the grant] mishandling, which could stem from anything such as a possible conflict of interest or racial discrimination. Neither should we be held responsible for his highly improper behavior, or the reporting of it to the NSF administration — which would have to be the last resort by us for fear of reprisal. Indeed, denial of our appeal would only make us a victim once again."

The HST codirector (acting in Professor Gray's place during vacation) emphatically denied approval of it.

> "As you may know, an appeal to the NSF Deputy Director . . . must be approved up the chain of command at MIT all the way to the president's office. In my opinion the letter you have written is inflammatory and confrontational, and is not in the best interests of you, HST, or the Institute. It should not be sent further."

Shortly afterward, both the vice-president and dean of research and the university provost denied approval. The provost called upon Dr. Poon to present to him "any evidence to support such a serious charge" as "racial discrimination" at NSF. No such evidence appears in the record.

In November, 2001, Dr. Poon was investigating a possible appointment at Harvard University and Massachusetts General Hospital. He requested that, in the event of the appointment, he retain his office and laboratory space at MIT. He reported his belief that another HST scientist (who was not Asian) had a primary appointment at Harvard and office and laboratory space at MIT. After consultation with another researcher about space, the codirector of HST (not Professor Gray) concluded that space constraints at MIT could not permit Dr. Poon's continued allocation if he were to move his primary appointment elsewhere. The offer of a new appointment never materialized.

Finally, in December of 2004, the same HST codirector met with Dr. Poon as part of a performance review for that year. The evaluation centered upon two subjects. He rated Dr. Poon's achievement of funding for research projects as "good" and as a source of satisfaction of HST. At the same time the codirector characterized the required supervision and mentoring of graduate students in his laboratory as "disappointing" and "sub-par." The review cited conflicts with two such students and a resulting confrontation with an HST colleague. It concluded that this supervisory performance and "the pattern of contentious interpersonal interactions with your professional peers and colleagues" prevented "a fully favorable performance review." The codirector recommended Dr. Poon for a three percent merit-based salary increase rather than a maximum four percent.

d. *Interpersonal relations*. In support of its motion for summary judgment and in accordance with Superior Court Rule 9A(b)(5), MIT submitted multiple allegations, with supporting record references, of interpersonal conflicts between Dr. Poon and colleagues, administrators, and students. It characterized the alleged facts as material because they supported legitimate grounds for actions which Dr. Poon characterized as discriminatory refusal of promotion or retaliation. In the following particulars, Dr. Poon's rule 9A(b)(5) responses left intact or admitted certain information of personal friction or conflict.[7] He acknowledged that during his career at HST he had experienced multiple disagreements with faculty and staff at MIT inside and outside HST. Several scientists and at least one graduate student had left his laboratory as a result of disputes with him. In 2001, a research scientist resigned from HST as the result of a dispute with him. Dr. Poon accused Professor Gray and the HST personnel department with discrimination and harassment toward him and the personnel administrator with "sabotage" by reason of their support of the research scientist. Dr. Poon had engaged in certain verbally abusive and hostile conflicts with HST administrators. In 1997, HST designated Dr. Poon as the principal investigator of two funding proposals intended to create a neuroengineering initiative. The proposals did not progress. In 1999, HST had then designated an MIT faculty member as an alternate principal investigator to undertake a new grant application for the neuroengineering initiative.

Finally, the voluminous summary judgment record contains

---

[7]The rule is purposeful, rigorous, and useful amid sprawling and amorphous summary judgment records in discrimination suits and other complex litigation. See *Sullivan* v. *Liberty Mutual Ins. Co.*, 444 Mass. 34, 46 n.18 (2005), quoting from *Dziamba* v. *Warner & Stackpole, LLP*, 56 Mass. App. Ct. 397, 399 (2002) ("The [provision] 'is an "anti-ferreting" rule designed to assist a trial judge in the all too typical situation in which the parties throw a foot-high mass of undifferentiated material at the judge,' who must then determine whether the record contains any material facts in dispute"). The movant's allegations, with proper support in record references, require specific contradiction, also with the support of record reference, in order to preserve a dispute of material fact. The omission of a specific denial or contradiction particularly grounded in the summary judgment record results in an effective admission. See *LaLonde* v. *Eissner*, 405 Mass. 207, 209 (1989); *Dziamba* v. *Warner & Stackpole, LLP, supra* at 399-401 (2002); *Young* v. *Boston Univ.*, 64 Mass. App. Ct. 586, 588 (2005).

no specific derogation of Dr. Poon's individual research skills as a PRS. Nor does it contain any deprecation of his Asian identity by any member of the HST or MIT community.

*Discussion.* 1. *Standard of review.* From the same record as the motion judge, the reviewing court examines the allowance of summary judgment de novo. *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 123 n.1 (1997) (the record is open to independent consideration on appeal; the appellate court may make its own compilation from the record to decide the ultimate questions of the correctness of summary judgment). We assess the factual information in the light most favorable to the nonmoving or opposing party (Dr. Poon) and then determine whether the record resolves the material questions of fact and the issues of law in favor of the movant. *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). *Correllas* v. *Viveiros*, 410 Mass. 314, 316-317 (1991). *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. 34, 35 (2005). The "most favorable" light does not exclude adverse facts. It illuminates both positive and negative information. See *Sullivan* v. *Liberty Mut. Ins. Co.*, *supra* at 35-37 (taking account of concerns about the employee's "responsiveness to clients," "collegiality," and "human relations skills"). In a typical posture presented here, the defendant moving parties, MIT and Professor Gray, shoulder the burden of demonstrating the absence of genuine issues of discrimination and retaliation even though they would not bear that burden at trial. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991); *Matthews* v. *Ocean Spray Cranberries, Inc.*, *supra* at 127. They may do so by showing that Dr. Poon has no reasonable expectation of proving an essential element of his prima facie claims at trial. *Ibid.*

Earlier Massachusetts employment discrimination decisions cautioned against disposition by summary judgment because those disputes hinge on questions of mentality and credibility traditionally committed to the first-hand observation of witnesses by a trier of fact. *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 439-440 (1995), and cases cited. See *Matthews* v. *Ocean Spray Cranberries, Inc.*, *supra*; *Sullivan* v. *Liberty Mut. Ins. Co.*, *supra* at 39. However, a substantial exception has evolved for the category of cases in which a

defendant employer demonstrates that the employee's "evidence of intent, motive, or state of mind is insufficient to support a judgment in the plaintiff's favor." *Blare* v. *Husky Injection Molding Sys. Boston, Inc., supra* at 440, and cases cited. See *Matthews* v. *Ocean Spray Cranberries, Inc., supra* at 127 (affirming summary judgment against the allegation of discriminatory motive); *Sullivan* v. *Liberty Mut. Ins. Co., supra* (same); *Romero* v. *UHS of Westwood Pembroke, Inc.,* 72 Mass. App. Ct. 539, 545-548 (2008) (same); and *Tardanico* v. *Aetna Life & Cas. Co.,* 41 Mass. App. Ct. 443, 447-450 (1996) (same). In appropriate circumstances summary judgment can filter out groundless accusations by disgruntled or terminated employees tempted to misuse the claim of discrimination as an excuse for deficiency or as an instrument of revenge. Summary disposition can relieve the innocent employer of the continuing burdens of litigation and cut short the stigmatizing imputation of workplace discrimination.

2. *The discrimination claims.* To establish liability for racially motivated employment discrimination under G. L. c. 151B, § 4(1), Dr. Poon must prove each of four prima facie elements: membership in a protected class; harm; discriminatory animus; and causation. *Lipchitz* v. *Raytheon Co.,* 434 Mass. 493, 502 (2001). *Sullivan* v. *Liberty Mut. Ins. Co., supra.* Most typically, as here, proof of forbidden motive and causation depend on circumstantial evidence. Massachusetts law has long managed the process of such circumstantial proof by the three-stage burden shifting sequence devised by the United States Supreme Court in implementation of the employment antidiscrimination provision of Title VII of the Civil Rights Acts of 1964, 42 U.S.C. §§ 2000e et seq. (1994), *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802 (1973), and adopted by the Supreme Judicial Court for cases arising under G. L. c. 151B, § 4, in *Wheelock College* v. *Massachusetts Commn. Against Discrimination,* 371 Mass. 130, 138 (1976). First, the employee must furnish evidence of a prima facie claim of discrimination so as to create a rebuttable presumption of wrongdoing. Second, the employer must articulate a legitimate, nondiscriminatory ground for its challenged action or omission and produce credible evidence in support of its good faith reliance upon that ground. Finally, if the employer has satisfied

that requirement, the employee loses the benefit of the rebuttable presumption and assumes the burden of proof by a fair preponderance of the evidence that the employer's explanation constitutes a pretext masking harmful discriminatory intent. The initial burden of the employee is not onerous. He need only produce evidence that the employer's actions, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. at 40, quoting from *Furnco Constr. Corp.* v. *Waters*, 438 U.S. 567, 577 (1978). Similarly the employer's second-stage burden is not heavy. It requires articulation and production, but not ultimate persuasion. *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. at 128.[8]

Most often the third stage becomes decisive. At the time of a summary judgment motion (usually upon completion of substantial discovery) by a defendant employer, as here, the question for the court reduces to whether the "record demonstrates that the [employer] has shown that the [employee] will be unable to prove at trial that the stated reason for [the challenged action] was a pretext." *Id.* at 129. Under that standard we now examine the record to determine whether Dr. Poon shows any reasonable prospect of proof at trial that the reasons given by MIT and Professor Gray for his nonpromotion in 1997 and 2001 were pretextual. Like the motion judge, we conclude that he does not have a reasonable expectation of proving pretext at trial.[9] We

[8]The burden of ultimate proof of discrimination, of course, never leaves the plaintiff employee. While these basic points occur in multiple Massachusetts decisions, we consult their application specifically in the *Matthews* and *Sullivan* reasoning because those cases, like this one, presented the question of the correctness of summary judgment in favor of the defendant employer.

[9]Our focus centers on the concept of pretext. Two decisions explain further the relation of pretext and discriminatory motive. They are not equivalent. A pretext, i.e., a false or untrue reason for adverse action by the employer against the employee, serves as evidence of bad motive. It "permits but does not compel" a finding of discrimination. It does not substitute for that essential prima facie element of discriminatory motive. An employer may still counter evidence or a finding of a pretextual explanation by proof of an independent nondiscriminatory reason for its action. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 115, 117-118 (2000); *Lipchitz* v. *Raytheon Co.*, 434 Mass. at 502-503 & n.15. For example, an employer might terminate a long-time employee within a protected class for pilferage, but record the reasons as occasional tardiness so as not to stigmatize the worker in the eyes of prospective employers. The recorded reason would be pretextual but not discriminatory.

conclude further that he has not generated a genuine issue of material fact of pretext.[10]

a. *Nonpromotion in 1997.* Dr. Poon reasons that the summary judgment record furnishes the prima facie evidence required of him in stage one of the evidentiary process. He acknowledges for the sake of argument that the motion judge found MIT's references to "longstanding issues with Dr. Poon's interpersonal skills" to satisfy its second stage burden of explanation and production of evidence of a valid nondiscriminatory ground for nonpromotion. The decisive issue then becomes the sufficiency of evidence of the defendants' alleged pretextual explanation for nonpromotion. He argues that the summary judgment record contains the following particular evidence of a pretextual denial of promotion in 1997, and that the presence of pretext alone defeats the motion for summary judgment:[11] (i) the performance review committee did not fulfil the procedures prescribed in the guidelines; (ii) it failed to document his alleged interpersonal failings; and (iii) it offered changing and inconsistent explanations for this nonpromotion.

For the following reasons, the evidence of the 1997 evaluation does not establish pretextual behavior by MIT or Professor Gray. First, the alleged harm inflicted was the denial of promotion. The record does not show the process to have been a promotional event. The guidelines creating it do not employ that word or concept. They characterize the process as a "formal

[10]We add this point because a latent ambiguity may exist in the case law. Traditional summary judgment language sets as the standard of inquiry whether the record shows "no genuine issue as to [a] material fact," Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). The court in *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. at 129, and in *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. at 55, indicates that the employee must have "shown" or "established" pretext at the summary judgment stage in order to survive the employer's motion, and not merely to have created a genuine issue of fact of pretext. Under either standard, for the reasons following, we find Dr. Poon's evidence insufficient against the overriding preponderance of the record.

[11]Dr. Poon emphasizes that, at the stage of summary judgment and at trial, Massachusetts law regards a showing of a pretext per se (pretext-only) as sufficient basis for a reasonable inference of discriminatory intent capable of clearing the summary judgment hurdle and of reaching the ultimate trier of fact. *Abramian* v. *President & Fellows of Harvard College, supra* at 117-118 & n.7. *Lipchitz* v. *Raytheon Co., supra* at 502-503 & n.15.

review." The closest reference to the subject of promotion was entirely preliminary: "This assessment will also address whether the individual is properly ranked in the classification, as well as the probability for advancement to a higher rank." A mature, formal application for promotion appears to be a subsequent process dependent upon a favorable outcome of the quadrennial review. Although he may have been naturally hopeful that a favorable four-year review would lead to promotion, between 1997 and 2001, Dr. Poon did not pursue the event as a current, formal application for elevation to SRS status.

Second, the "most probative means of establishing . . . pretext . . . is to demonstrate that similarly situated [non-Asian or Caucasian] employees were treated differently." *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. at 129. The record does not show that any non-Asian or Caucasian member of HST achieved promotion to SRS in 1997 or at any other time during the 1993-2004 period covered by Dr. Poon's Superior Court complaint.

In addition, the summary judgment record does not, on balance, support the inference of pretext proposed by Dr. Poon. As to the procedures prescribed by the guidelines for four-year review to PRS individuals, the HST unit admittedly did not conduct a full procedure or create a detailed record for Dr. Poon, but furnished the reason that such a record would have harmed, rather than helped, his career. In combination with the circumstances of (i) the absence of any effort ever to terminate Dr. Poon and (ii) the documented history of episodic friction with students, staff, and colleagues, that explanation acquires credibility and resists characterization as a pretext at all, or a harmful pretext in particular. Nor does the record show a pattern of inconsistent and shifting explanations for his nonpromotion. As of 1997, the university's policies and procedures called for the additional abilities of direction and leadership from an SRS. The truncated 1997 review was more credible as an effort to mute criticism of his shortcomings than it was as an effort to block his promotion.

Finally, evidence of pretext must be "credible." *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. at 55. Dr. Poon has identified points of departure by HST from precise personnel record-

keeping and management. However, neither separately nor together do they demonstrate pretext, especially in light of Dr. Poon's long-term retention and the documentary evidence of his conflicts with other personnel at the university. These deviations are consistent with MIT's explanation of its 1997 personnel review as a benevolent avoidance of a dangerous subject.

b. *Nonpromotion in 2001.* As evidence of pretext in the explicit rejection of promotion by the HST personnel committee in 2001, Dr. Poon cites inconsistent explanations and the application of a heightened, subjective standard to his application. However, the contemporaneous statement of the committee with its vote on November 27, 2001, extends a consistent theme: an SRS must possess qualities of programmatic leadership and thorough integration with the work of his unit, as well as extraordinary (world-class) scientific stature. This statement emphasizes, but does not alter, the standing requirements of the university's policies and procedures for extraordinary technical and *personal* capacities.

In sum, the evidence of the summary judgment record is not sufficient to generate a genuine issue of false explanation by MIT and Professor Gray. Against the preponderant information of the record, a finding of pretext would require a speculative leap well beyond the length of a reasonable inference. The factual materials show one-sidedly that MIT did not fabricate a rationale for the decision not to promote Dr. Poon.[12]

3. *Retaliation.* Section 4(4) of G. L. c. 151B forbids an employer "to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint" against alleged discriminatory conduct. A prima facie claim of retaliation requires proof (1) that the claimant engaged in protected conduct; (2) that he suffered some adverse action; and (3) that a causal connection links the protected conduct and the adverse

---

[12]The record does teach that the pretext-only standard may expose an employer to the dangers of its own leniency if it fails to give protected-class employees timely and forthright evaluations, however unpleasant in the collegial cultures of learned professions and great academies. A pretext, whether benevolent or malevolent, may become an evidentiary hook hoisting the employer all the way to trial.

action. *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 662 (1996). *Mole* v. *University of Mass.*, 442 Mass. 582, 591-592 (2004). The claim of retaliation functions independently of the claim of discrimination. *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 121-122 (2000). The plaintiff need not establish actual discrimination in order to prove retaliation. He need only show that he acted in good faith and in the reasonable belief of wrongful discrimination by his employer and that the employer's desire to retaliate was a determinant of a resulting adverse action. *Tate* v. *Department of Mental Health*, 419 Mass. 356, 364 (1995). A change in working conditions can constitute an adverse action if it "materially disadvantage[s]" the plaintiff. *MacCormack* v. *Boston Edison Co., supra* at 662.

A substantial interim between the protected conduct and the alleged retaliation can stretch the inference of a causal connection to the breaking point. "[A]s the elapsed time between those two events becomes greater, the inference weakens and eventually collapses." *Mole* v. *University of Mass., supra* at 595. See e.g., *Dube* v. *Middlesex Corp.*, 59 Mass. App. Ct. 734, 740-741 & n.3 (2003) (affirmance of summary judgment; interval of nine months between the protected activity and the adverse action); *Oliver* v. *Digital Equip. Corp.*, 846 F.2d 103, 110-111 (1st Cir. 1988) (interval of more than two years between the complaint and the firing; insufficient evidence of causation).

Under these criteria, Dr. Poon has no reasonable expectation of proof that any one of the identified incidents after his letter complaint of May 9, 2001, to Professor Gray qualified as retaliation. None of them satisfies the required prima facie elements of that cause of action. The proposed relocation and reduction of his office space in July of 2001 never matured into an adverse action. Professor Gray responded that the relocation had been part of a larger long-term scheme of reorganization and promptly canceled his move.

Dr. Poon characterized MIT's refusal in August and September of 2001 to support his appeal from the denial of an NSF grant as an unjustified decision harming his access to funding and causing a material disadvantage. Professor Gray did not participate in that episode. The HST codirector, the university vice-

president and dean of research, and the provost unanimously found the proposed appeal unsupportable. Any adversity from that action would be entirely conjectural. Dr. Poon could not show any probability of success for the NSF appeal. It is probative that three high ranking scientists at the university rejected the effort. Most troubling, Dr. Poon's draft letter of appeal submitted for their approval speculated that an NSF officer may have acted out of a "conflict of interest" or "racial discrimination" so as to render HST and him "a victim once again." This language cast a harsh light on Dr. Poon's judgment and social skills, and provided abundant nonretaliatory justification for the denial of support for the appeal.

The November, 2001, denial of office and laboratory space at MIT in the event of an appointment at Harvard and Massachusetts General Hospital (again by an officer other than Professor Gray) never developed into an adverse action because the appointment did not materialize. Any harm is entirely hypothetical. Even if the appointment had come through, Dr. Poon would still have to demonstrate, as a genuine issue of material fact, that the rejection of such an arrangement constituted retaliation rather than the refusal of an impractical special arrangement.

Finally, Dr. Poon's mixed annual merit rating at the end of 2004 (again by the HST codirector other than Professor Gray) occurred more than three years after his original charge of discrimination in May of 2001, and his submission of charges to the MCAD in November of 2001. The evaluation was balanced. It included praise for his funding ability. It found no fault with his research work or publications. It did criticize his supervisory and interpersonal relations with graduate students and with faculty and administrative personnel, with citation to specific events and personnel. Documentation in the record supports the characterization of one prior conflict with a laboratory colleague as especially turbulent. Dr. Poon has not introduced evidence of inaccuracy or unfairness of the evaluation. Finally, in the circumstances of this case, the sanction of a prospective merit raise of three percent rather than the maximum four percent does not have the character of a materially disadvantageous employment action. See *Tang* v. *Rhode Island Dept. of Elderly Affairs*, 163 F.3d 7, 13 (1st Cir. 1998) ("minor changes or inconveniences" are not actionable harm).

*Conclusion.* The record shows that Dr. Poon would have no reasonable expectation of proving claims of discrimination and retaliation at trial. The motion judge correctly entered full summary judgment in favor of the defendants MIT and Professor Gray.

*Judgment affirmed.*