NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-695

MARIE E. COLEMAN & another[1]

vs.

CAMBRIDGE SAVINGS BANK.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiffs, Marie Coleman and Alda Soares, appeal from a summary judgment in favor of the defendant, Cambridge Savings Bank (CSB), on their employment discrimination claims brought pursuant to the antidiscrimination statute, G. L. c. 151B, and their promissory estoppel claims. The case arose from CSB's termination of the plaintiffs' employment after they violated CSB's bank vault security policy. We affirm the summary judgment.

Background. We briefly summarize the facts from the summary judgment record in the light most favorable to the plaintiffs, reserving certain facts for later discussion. See

_____

[1] Alda V. Soares.

Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 550 n.6 (2008).

CSB hired Coleman as assistant vice-president, branch sales and service manager in 2013. She was an at-will employee, part of the management team, and "generally was responsible for the operations of [the Inman Square] branch" of CSB in Cambridge. Coleman is an African-American woman who was over the age of forty at all times relevant to the instant case.

CSB hired Soares in 1995, promoted her to retail operations manager in 1998, and promoted her again to assistant branch manager of its Inman Square branch (hereafter "Branch") in 1999. She was part of the management team at CSB and was always an at-will employee. Soares was over the age of forty at all times relevant to the instant case.

CSB had a security policy that set out requirements for bank vault access. The plaintiffs, "as part of their respective roles in Branch management," were responsible for ensuring compliance with the security policy, which included a "[d]ual [c]ontrol procedure" requiring two people to be present each time the bank vault was opened at CSB. Under the dual control procedure, CSB split the combination to the vault into an "A" combination and "B" combination, and CSB prohibited any single person from having access to the entire vault combination. Coleman, Soares, and the head teller, Nilsa Brita-Barbosa, held

2

the A combination and the tellers at the Branch held the B combination to the vault.  CSB also required the Branch to "maintain a log on which each person present when the vault was opened was to sign the log to attest that at least two people were present when the vault was opened."  If the Branch needed to open the vault but individuals with the A or B combination were not present, staff "were required to call [CSB]'s Operations Department so that [it] could provide the missing portion of the vault combination and then reset the entire vault combination."  Both plaintiffs knew of this requirement, and, in fact, had invoked the procedure and contacted CSB's Operations Department in January of 2016.

On February 10, 2016, Coleman was present at the Branch when the vault was to be opened, but no person with the B combination was present.  In an effort to open the Branch for business, Coleman contacted the employee with the B combination who was out sick that day and CSB's Operation's Department, but neither responded.  Coleman then retrieved a copy of the B combination that she and Soares, who was not present at the Branch at the time, previously decided to store in Soares's office desk.  The B combination was stored in Soares's desk for approximately one week.  An employee with the B combination had placed the B combination inside of a sealed envelope that Soares

3

never opened.  Coleman and Soares knew that storing the B combination in that location and manner violated CSB policy.

Aware that she was being filmed by the Branch's security system, Coleman used the stored B combination to open the vault in the presence of head teller Brita-Barbosa.  All cash and negotiable instruments were secured in separate money vaults with different combinations that Coleman did not possess.  Both Coleman and Brita-Barbosa signed the vault log to indicate their presence when the vault was opened, but Coleman did not contact the Operations Department to reset the vault's combination.  CSB learned of the policy violation from Brita-Barbosa.

On February 18, 2016, Carol Sexton and Christine Mauras of CSB's Operations Department met with Coleman to discuss the February 10 incident.  Coleman was less than forthcoming and at one point provided a false explanation regarding some of the events at issue.  Coleman later claimed that she had fallen down the stairs at home the day before the meeting and felt dizzy during the meeting.

On February 22, 2016, Mauras and David Walker, also of CSB's Operations Department, met with Soares to discuss the events of February 10.  In that meeting, Soares admitted to storing the B combination to the vault in her desk and signing the vault log for the opening on February 10, even though she was not present for the vault opening that day.  Soares knew

4

that she was required to sign the vault log when the vault was opened, and not at some later time.

On March 3, 2016, CSB terminated Coleman's employment for violating the security policy, in particular the dual control procedure.  That same day, CSB also terminated Soares's employment for violating the security policy, in particular the dual control procedure, and for "falsifying the [v]ault [l]og."  There was no evidence that any other CSB employee had violated the dual control procedure in any of CSB's branches.

Coleman and Soares contend that CSB's decision to terminate their employment was an act of age discrimination.  Coleman further claims that CSB's decision to terminate her employment was an act of race discrimination.[2]

Discussion.  Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).  In reviewing a grant of summary judgment, we assess the record de novo and

_____

[2] In their brief, the plaintiffs assert that they "were subjected to a hostile work environment."  We note that count five of the plaintiffs' complaint, in which Coleman alleged a "failure to supervise" that subjected her "to a hostile work environment," was previously dismissed upon CSB's motion to dismiss.  In any event, as discussed infra, the evidence the plaintiffs cite in support of their age and race discrimination claims is speculative, conclusory, supported by citations to the record that do not stand for the propositions cited, and thus insufficient as a matter of law.

take the facts, together with all reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  See Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119 (2010).  "[T]he court does not 'pass upon the credibility of witnesses or the weight of the evidence [or] make [its] own decision of facts.'"  Shawmut Worcester County Bank, N.A. v. Miller, 398 Mass. 273, 281 (1986), quoting Attorney Gen. v. Bailey, 386 Mass. 367, 370, cert. denied, 459 U.S. 970 (1982).

1.  Employment discrimination.  An employee bringing a complaint under G. L. c. 151B, § 4, must demonstrate that:  (1) the employee is a member of a protected class; (2) the employee was subject to an adverse employment action; (3) the employer bore discriminatory animus in taking that action; and (4) animus was the actual reason for that action (i.e., causation).  See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680 (2016).  As to both the race and age discrimination claims, there is no dispute that both plaintiffs are members of a protected class and were subject to an adverse employment action.  Thus, this case turns on discriminatory animus.  "Because . . . direct evidence [of the elements of discriminatory animus and causation] rarely exists, . . . an employee plaintiff [asserting discrimination] may also survive [a summary judgment motion] by . . . using . . . [a] three-stage, burden-shifting paradigm" (quotations and citations omitted).  Id. at 680-681.  At the

6

first stage of this paradigm, plaintiffs bear the burden to demonstrate a prima facie case of discrimination by providing "evidence that:  (1) [they are] a member of a class protected by G. L. c. 151B; (2) [they] performed [their] job at an acceptable level; [and] (3) [they were] terminated."  Id. at 681, quoting Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441 (1995).  At the second stage, an employer "can rebut the presumption created by the prima facie case by articulating a legitimate, nondiscriminatory reason for its [employment] decision."  Blare, supra.  At the third stage, "the burden of production shifts back to the plaintiff employee, requiring the employee to provide evidence that 'the employer's articulated justification [for the termination] is not true but a pretext.'"  Bulwer, supra at 681, quoting Blare, supra at 443.

The present case hinges on whether in the face of the legitimate, nondiscriminatory reason for the adverse employment action -- here, the violation of the dual control policy and Soares's falsification of the vault log -- the plaintiffs provided evidence that the employer's articulated justification "is not true but a pretext."  Bulwer, 473 Mass. at 681.

As to Coleman's race discrimination claim, she contends, inter alia, that the evidence of pretext included the following: during the course of her employment at CSB, there were "no individuals in upper management who were Black"; CSB's "lack of

7

commitment to a diverse workforce and workplace culture made [her] very uncomfortable"; one of CSB's operations managers "would make racist comments concerning the dress of Black employees" but "would not make such comments concerning Caucasian employees"; "Coleman's termination, without warning, stands in stark contrast to the treatment of white male managers under similar circumstances"; and CSB replaced Coleman with a white male without considering any African-American candidates. As to the plaintiffs' age discrimination claims, Coleman and Soares contend, inter alia, that it was standard policy for CSB "to prefer younger employees for hiring and promotion to management positions"; that "older employees were encouraged to accept lower positions"; that CSB replaced them with younger employees; and that Soares was "subjected to ageist belittling."

The plaintiffs' arguments suffer from a lack of evidentiary support. At the outset, we note that the plaintiffs claim that CSB refused to respond to discovery requests seeking to "identify each [CSB] employee aged [forty] or older that [CSB] discharged or laid off in the last ten years," the persons filling those positions, and "each African-American hired to a management position within the last ten (10) years." The plaintiffs make repeated refences to this alleged discovery violation and contend that it is "telling," and constitutes "unrefuted evidence" supporting their claims of age and race

8

discrimination.  We disagree.  There are myriad reasons for a party to object to discovery requests.  The Massachusetts Rules of Civil Procedure provide mechanisms, including motions to compel, to resolve discovery disputes.  See Mass. R. Civ. P. 26, as amended, 474 Mass. 1401 (2016); Mass. R. Civ. P. 37, as amended, 423 Mass. 1406 (1996).  Here, as plaintiffs acknowledged at oral argument, they did not file any motion to compel or otherwise avail themselves of any mechanism in the Superior Court to require production of such information.  Having failed to do so, they cannot claim that the unprovided discovery constitutes "evidence."  Indeed, they neither cite to any authority for this proposition nor are we aware of any.[3]  Consequently, the record does not contain comparator or statistical evidence to support the plaintiffs' claims.  Contrast Adams v. Schneider Elec. USA, Mass., No. SJC-13352, slip op. at 21 (June 21, 2023) (statistical data indicated "layoffs had a disproportionate effect on employees over fifty").

---

[3] The record before us does not reveal the propriety of CSB's objections or refusal to comply with all discovery requests and we do not speculate or opine as to the wisdom or fairness of CSB's actions.  We merely note that to the extent that the plaintiffs believed that CSB withheld available relevant discovery, the plaintiffs had an obligation to act in the Superior Court to try to obtain such information and did not do so.

Of course, statistical data is not available in all cases and, in any event, is not required to prove pretext in a discrimination claim.  See Blare, 419 Mass. at 439 (discriminatory intent "rarely is established by other than circumstantial evidence").  This brings us, however, to another shortcoming in the plaintiffs' claim:  the lack of actual admissible evidence in the summary judgment record to support the plaintiffs' assertions.

As evidence of pretext in their age discrimination claim, the plaintiffs contend that by 2015, CSB's standard policy was to prefer younger employees for hiring and promotion to management positions.  As evidence of that claim, the plaintiffs cite to Soares's deposition transcript wherein she testified that "even the setup of [CSB] was" designed to "attract more younger people, the students from Harvard and MIT, things like that"; that "it feels like -- to me, it's like they were trying to put more of an age group that is more -- more that -- more comparable to what the new -- the people they're trying to serve"; that "it feels like [CSB did not] want . . . older people, like, to be a head of the department or a head of the branch."  She further testified that "it was more like all these young crowds . . . they come at the lower pay than us, probably, I'm assuming.  I -- that, I don't know for sure."  Finally, she testified that she felt that her age was a factor.  Far from

10

demonstrating a standard policy, this testimony is speculative and does not rise the level of evidence of pretext.  A plaintiff's feeling, suspicion, or unsupported statement does not constitute admissible evidence at summary judgment.  See, e.g., White v. University of Massachusetts at Boston, 410 Mass. 553, 558 (1991); Brooks v. Peabody & Arnold, LLP, 71 Mass. App. Ct. 46, 56 (2008), quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").  Contrast Adams, No. SJC-13352, slip op. at 20-23 (plaintiff established genuine issue of material fact whether employer had policy to remove older staff for younger hires where evidence showed that, inter alia, layoffs had a disproportionate effect on older employees and corporate executives repeatedly "expressed concern about the age of their workforce," "stressed the need to make room for . . . younger talent," and suggested strategies to change the "demographics mix" through terminating older workers to hire younger college graduates).

The plaintiffs also argue, citing the deposition of a former CSB employee, Nikolay Hristov, that CSB "made it a practice to hire white males under age [forty] to fill [CSB]

11

management positions."  Asked "[w]hat facts [he was] relying on to make that assertion," Hristov testified that Coleman and Soares were let go in favor of younger managers.  He further testified that "there was a tendency [to] just promote white males, as far as I remember in [the] Newtonville branch, that's what I recall, it was younger guy got promoted, and I just don't remember the rest of it, but it was kind of obvious."  In other words, as evidence of their claim that CSB's actions were pretextual, the plaintiffs cite to Hristov's testimony (1) repeating that the plaintiffs themselves were terminated in favor of younger managers, and (2) his uncertain recollection, unsupported by specific facts, of CSB's "tendency."  Moreover, Hristov acknowledged that when he was under the age of forty, his manager at CSB had discouraged him from applying for promotions, yet, after he was over the age of forty, CSB promoted him.[4]  Asked again, in light of his promotion after he turned forty, to explain the basis for his claim that "it was the standard policy and procedure" of CSB to prefer white males under the age of forty, Hristov responded, "I mean, it looked that way."  Here again, we note that mere statements of belief or bare allegations unsupported by actual evidence, are

---

[4] Hristov further testified that he thought his promotion was not "about the age, it was about the experience," but when asked if he believed CSB makes promotion decisions based on candidates' experience, he responded that he did not "know what [CSB] does."

12

insufficient to defeat a moving party's motion for summary judgment. See White, 410 Mass. at 558; Brooks, 71 Mass. App. Ct. at 56. In any event, not only does Hristov's conclusory testimony fail to support the claim of CSB's alleged "standard policy"; it contradicts the claim as well.

Another means of establishing that an employer's proffered reason for termination is a pretext for discrimination is to demonstrate that "similarly situated" employees "in terms of performance, qualifications and conduct" were treated differently. See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129 (1997), quoting Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994). Here, to support the claim that Coleman's termination was in "stark contrast to the treatment of white male managers under similar circumstances," the plaintiffs cite only to Coleman's deposition testimony stating that a white male manager "gave out money without a withdrawal slip" in 2014 or 2015 and was promoted rather than terminated. Coleman's knowledge of this incident was based on hearsay statements told to her by others, and she could not recall any further details. This argument is thus unavailing.

We note that the plaintiffs do not contend that Brita-Barbosa was a similarly situated individual who was treated

differently.[5]  That notwithstanding and viewing the evidence in the light most favorable to the nonmoving party, even assuming arguendo that the plaintiffs implicitly contend that Brita-Barbosa is a similarly situated individual such that CSB's failure to discipline her demonstrates that the plaintiffs' termination was pretextual, the argument is unavailing.  Putting aside that the record is silent as to Brita-Barbosa's age or race, her being "present" when Coleman opened the vault and signing the vault log to document her presence is not "of comparable seriousness" to the plaintiffs' conduct.  Matthews, 426 Mass. at 130.  That Brita-Barbosa is the person who reported the incident to CSB further demonstrates that there are "differentiating or mitigating circumstances that would distinguish their situations" (quotation and citation omitted).[6]

---

[5] The plaintiffs state in their brief, without any further elaboration or legal argument, that "[a]lthough Ms. Brita-Barbosa also signed the vault log and was present when the vault was opened she was not disciplined by [CSB]."  Furthermore, not only did the plaintiffs not argue that Brita-Barbosa was a similarly situated individual for purposes of showing pretext; the plaintiffs disputed the inclusion of Brita-Barbosa's statements in the summary judgment record on the ground that they were inadmissible hearsay, and moved to strike them as well.

[6] While the plaintiffs disputed the inclusion of Brita-Barbosa's statements in Sexton's and Mauras's affidavits in the summary judgment record on the ground that they were inadmissible hearsay, they did not dispute the fact that Brita-Barbosa informed CSB of the incident.

Id.  Furthermore, the plaintiffs' assertion that CSB did not discipline Brita-Barbosa is unsupported by the record.[7]

As further evidence of alleged pretext to support her race discrimination claim, Coleman argued that one of CSB's operations mangers "would make racist comments concerning the dress of Black employees."  Asked at her deposition to identify such comments, Coleman clarified that she was referencing one comment made by Sexton about the "undergarments" worn by a Black customer service employee who worked in the Harvard Square branch of CSB.[8]

Coleman also contends that CSB replaced her with a white male without considering any African-American candidates, and that this action also constituted evidence of pretext.  Even assuming an admissible basis exists for this conclusory claim, the record reflects that Coleman and Soares were terminated on the same day, and CSB hired an individual who "identifies as Black or African American" to replace Soares.

Finally, asked to list each act of race discrimination, Coleman testified that there "was a lack of individuals who were

---

[7] As evidence that Brita-Barbosa was not disciplined by CSB, the plaintiffs cite only to Sexton's deposition testimony that she could not recall whether Brita-Barbosa was disciplined.
[8] Although Coleman's testimony is somewhat unclear, taken in the light most favorable to the plaintiffs, Sexton commented that the customer service employee's "skirt was so short you could see her panties."

15

culturally diverse"; that another African-American woman was hired on the same day that Coleman was hired; and that there were no individuals in upper management who were Black. These allegations suffer from the same problem as the above-referenced claims. The plaintiffs raise broad allegations of age and race discrimination, but the cited record references underlying each assertion reveal conclusory, speculative, unsupported, and even contradictory evidence.[9] Thus, even apart from the absence of comparator or statistical evidence, the plaintiffs offer insufficient anecdotal or other evidence to support their discrimination claims as a matter of law. "Against the preponderant information of the record, a finding of pretext would require a speculative leap well beyond the length of a reasonable inference." Chi Sang Poon v. Massachusetts Inst. of Tech., 74 Mass. App. Ct. 185, 199 (2009).

2. Promissory estoppel. The plaintiffs also assert that a rational jury could find that the plaintiffs reasonably relied on CSB's promise to adhere to the progressive discipline policy in their employee handbook. We disagree.

"An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to

---

[9] We note that the excerpts from depositions included in the record are, as the motion judge highlighted below, "highly fragmented" and "appear to be purposefully missing pages that would have afforded more context."

16

whom the promise was made reasonably relied on the representation."  Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 848 (1995), quoting Pappas Indus. Parks, Inc. v. Psarros, 24 Mass. App. Ct. 596, 599 (1987). Here, the progressive discipline policy states, inter alia, that "[p]rogressive discipline is a standard method of upgrading the performance and/or conduct of employees having difficulty meeting [CSB's] expectations"; that the policy is "not intended in any way to alter the employment at will relationship between [CSB] and its employees"; and that CSB "at all times retains the discretion to modify or eliminate any or all of the following procedures according to the circumstances of the disciplinary matter."  Both plaintiffs testified during their depositions that they understood that the policy did not alter their at-will employment relationship.[10]  Accordingly, the plaintiffs' promissory estoppel claim is insufficient as a matter of law where they can neither show that CSB made an unambiguous promise to adhere to the progressive discipline policy prior to

---

[10] Coleman understood that with respect to its progressive discipline policy, CSB was "not committing to following any particular steps."  Similarly, when asked about the portion of the policy that states that "[t]he following progressive discipline procedures are not intended in any way to alter the employment-at-will relationship between [CSB] and its employees," Soares acknowledged that "you can still be terminate -- you know, that it's -- are not intended to -- that [the policy] is not like a contract."

17

termination, nor that they reasonably relied on it.  See

Varadian, supra at 848-850.[11]

Judgment affirmed.

By the Court (Wolohojian,
Neyman & Smyth, JJ.[12]),

*Joseph F. Stanton*

Clerk

Entered:  August 17, 2023.

---

[11] To the extent that we have not specifically addressed subsidiary arguments in the parties' briefs, they have been considered, and do not warrant further discussion.  See Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).

[12] The panelists are listed in order of seniority.