*337 Sikora, J.
(concurring in part and dissenting in part, with whom Meade, J., joins). I concur in the affirmance of summary judgment entered by the Superior Court judge on Dr. Bernard Bulwer’s claims of (1) retaliation against his complaint of discrimination, as prohibited by G. L. c. 151B, § 4, by Mount Auburn Hospital (MAH); (2) defamation by MAH; and (3) tortious interference with his residency contract by the three individual physician defendants. I dissent from the reversal of summary judgment entered by the judge against Bulwer’s remaining claims of (1) discrimination based on his race and national origin within the meaning of G. L. c. 15IB, § 4, by MAH; and (2) breach of his residency contract by MAH.
The rationale offered by the majority in support of its discrimination analysis constitutes an extraordinary aberration from basic principles of evidence. It violates settled standards of summary judgment practice and draws appellate judges into the act of second guessing professional medical judgments. A gaping deficiency extends through the core of its position: the absence of any admissible evidence, and indeed of any trustworthy information, creating a genuine material factual issue of racial animus or of a pretext veiling racial animus on the part of MAH and its physicians; and the presence of abundant admissible evidence of unsatisfactory medical performance by Bulwer.
The majority’s treatment of the breach of contract claim relies in part upon the premise of MAH’s possible engagement in racial discrimination and fails in part with that claim. The remaining bases of the majority’s contract reasoning rest upon an erroneous interpretation of the contract and fail as a matter of law. I would affirm in full the thorough analysis of all claims by the Superior Court judge in her lengthy memorandum of decision and her entry of summary judgment on all counts.
Background. A full and accurate account of the relevant summary judgment record of this unfortunate case requires substantial enlargement of the majority’s portrayal.
1. Biography. Bulwer achieved his medical degree in 1989 from the University of the West Indies. From that date into 2002, he practiced in Trinidad (1989-1991), Belize (1991-1993), the United Kingdom (1994-1996), and again in Belize (1997-2002). He received a master of science degree in nutrition in 1994 in the United Kingdom. His practice during those years centered in subjects of nutrition and diabetes. His curriculum vitae lists author- *338 ships of seven journal articles, ten book chapters, and either authorship or editorship of seven books.
Bulwer came to the United States in 2002. His first experience in the American medical system was participation as a research associate and fellow in a subresidency cardiology program at Brigham and Women’s Hospital in Boston from 2002 to 2005. In the course of that work he brought a charge of discrimination against a supervisor. An ombudsman resolved that dispute by terms omitted from our record.
In April, 2005, Bulwer wrote to Dr. Eric Flint, the director of MAH’s internal medicine residency program, and inquired about a position. Flint interviewed Bulwer and thought him personable, capable, and well trained. Bulwer did not inform Flint of his discrimination claim at Brigham and Women’s Hospital. In June of 2005, MAH offered Bulwer a residency position in internal medicine. He would begin his residency in September of 2005, two months after the normal commencement in July. He signed a one-year medical resident agreement (MRA). With the approval of MAH, it was renewable on an annual basis for two additional years.
2. Bulwer’s rotations. In September of 2005, Bulwer began his monthly rotations at MAH. Various supervising physicians evaluated residents’ performances within the rotations. In addition, the clinical competence committee (CCC), comprised of thirteen physicians and advisers, met periodically to assess residents’ progress. The CCC determined whether MAH should retain and advance residents on the basis of satisfactory completion of educational and training objectives.
MAH’s residency program complied with standards set by the National Accreditation Counsel for Graduate Medical Education (ACGME). The ACGME mandated a member hospital to require demonstrated competence in (1) patient care, (2) medical knowledge, (3) practice-based learning, (4) interpersonal and communication skills with patients, families, and other health professionals, (5) professionalism, and (6) systems-based (high technology) practice. MAH supervisory physicians graded residents in each of these six core competencies at the conclusion of each monthly rotation.[1]
*339 Bulwer’s opening assignment in September, 2005, to the emergency medicine department went well. His supervisors viewed his work favorably, with one exception.[2]
However, Bulwer’s October rotation in the medical intensive care unit (MICU) resulted in evaluations of unsatisfactory performance from all three of his supervisors. One gave him failing (“needs improvement”) grades in all six core competencies; another in five; and a third in three. Critical commentary accompanied the grades. One supervisor wrote, among other concerns, “Made drastic and potentially dangerous/life threatening decisions about [patient] care [without] consulting attending. Was not always honest about [patient] care and his role as the intern (i.e. labs ordered, medications ordered). Needs to improve [history] & [physical] writing skills, especially assessment and plan. . . . Too confident for his own good and [patient’s] own good without showing any proof of capability to perform at the level of an intern or resident yet.” A second evaluator commented that Bulwer was “optimistic” and “eager to learn” but that “[h]e does not seem to be aware of his responsibilities as an intern despite being told them repeatedly.” A third wrote that, as goals for improvement, Bulwer needed to increase his fund of knowledge, to improve the depth of his histories and physicals, and to “take feedback as constructive criticism and improve [his] attitude.” In late October, that evaluator (Dr. Carey Thomson, a senior attending physician in the MICU) met with Bulwer to discuss those concerns further.
The October evaluations identified weaknesses in three of the residency program’s six prescribed areas of core competency: (1) Bulwer’s grasp of complex cases; (2) professionalism and interpersonal communications; and (3) practice-based learning, i.e., the capacity to accept and to learn from evaluation and criticism. Bulwer disagreed with the October evaluations, and sent written objections to his supervisors and to Flint.
In mid-November, Dr. Lori Balestrero, his adviser, met with Bulwer to discuss the evaluations. A memorandum resulting from the meeting and signed by Bulwer acknowledged that he “understands [that] continuation in the program is contingent on his improved performance.” On December 1, the CCC and Balestrero *340 forwarded to Bulwer a memorandum proposing a six-point remedial plan for improvement during the month of December.[3]
Meanwhile in November and December, Bulwer performed a “wards” rotation comprised of evaluation and care of patients admitted to MAH. Three evaluations from that rotation appear in the summary judgment record. One supervisor graded Bulwer positively, urged him to communicate more concisely, but credited him with “much improvement.” A second evaluator (who did not give specific grades) wrote to Bulwer, Balestrero, and Flint that Bulwer’s history, physical, and progress notes were “[ojver-all. . . pretty good” but could benefit from greater conciseness or specificity. The third supervisor awarded an over-all passing grade, but found him deficient in practice-based learning and improvement (failure to accept feedback and undertake improvement), professionalism (failure to accept responsibility for actions and decisions), and — most particularly — the organization of notes of patients’ physical examinations and progress.
Bulwer’s January, 2006, rotation occurred in the cardiology department and generated three evaluations. One supervising physician gave Bulwer high marks in all competencies without narrative comment. A second gave him passing grades and favorable comments, and a recommendation for deeper patient presentations. However a third supervisor gave him predominantly failing grades in five of the six competencies, with no additional commentary.
In February, Bulwer returned to a wards rotation. Two supervisors evaluated him. One gave him over-all passing grades with two reservations: his questionable ability to “synthesize[ ] key information in the history, physical (exam) and data to develop an accurate, problem-based assessment and plan,” including the development of an expanded differential diagnosis; and his uncertain capacity for practice-based learning and improvement, or more specifically his acceptance of feedback for self-assessment and improvement.
The other February wards evaluation was severely critical. Dr. Erica Bial had supervised Bulwer throughout the month. She gave him failing grades in all six competencies: the minimum grade of 1 in four of them and the grade of 2 in the other two. Her *341 extended commentary was emphatic: “My experience of Dr. Bernard Bulwer during our month together on the wards was horrendous. I feel that Bernard is a poor intern, and that he suffers major deficiencies, many of which I am gravely concerned are impossible to remediate. There is no aspect of the central competencies in which Bernard is evenly modestly competent, and in truth I cannot envision his possessing the ability to ever function as a resident in this program. My concerns can be summarized into four major areas: Clinical Knowledge, Communication Skills, Patient Care, and Professionalism.” She elaborated upon those failings with rigorous specificity and examples.
As to clinical knowledge, Bial found that Bulwer showed a specialized interest in echocardiology but that he failed to seek and integrate new clinical knowledge into his daily practice upon the general patient population in the wards. He seemed “intellectually disorganized, confused, and just plain ill-informed about physiologic processes, algorithmic evaluation, and options for treatment of most diseases.” These shortcomings required her oversight “even on the moment-to-moment management of ‘simple’ patients.”
As to communication skills, Bial found Bulwer unwilling to ask for help in cases beyond his experience, unable to keep her informed of changes in patients’ plans and of emergency clinical concerns, and “belligerent” in response to evaluation. She viewed his presentations on rounds to be incomplete and disorganized. He did not adequately communicate treatment plans to patients and families and treated coworkers, instructors, and nurses disrespectfully. He would not honestly acknowledge to her his failure to communicate with consultants, to write orders, and to keep up with his daily clinical tasks.
In her assessment of patient care, Bial credited Bulwer with genuine concern with the well-being of patients but found him unable to function efficiently in the hospital environment. In particular, his average time to complete an initial history, physical, and admission note approximated three hours. He did not stay informed of the results of laboratory and diagnostic tests and of new patient data. His histories and physical notes were unclear and meandering. He did not readily establish rapport, trust, and respect with patients and families.
As to professionalism, Bial concluded that Bulwer “refuses to accept constructive criticism,” “has no capacity whatsoever for self-assessment,” treated her with hostility, and resented direction *342 from women in a professional environment. His age and experience caused him to describe his first-year residency status as a “grave indignity” and “beneath him.” She viewed those traits as irremediable. “While he certainly talks the talk of someone eager to learn and participate, his actions demonstrate an individual who fails to communicate or function even minimally effectively as a member of the medical team.” Bial offered to meet with the program director for further discussion.
The majority does not set out the sequence of Bulwer’s six rotations in clear order. In particular, it blurs the timing of the February, 2006, evaluations. The chronology is important. It indicates a failure of improvement and the resistance to remediation by Bulwer during the four months between the October and February evaluations. No positive trend had taken hold despite the involvement of his adviser (Balestrero) and the CCC during November and December. His professional shortcomings remained persistent and thematic.
The thirteen-member CCC considered the evaluations. On April 5, 2006, it notified Bulwer that it had confirmed “areas of concern” precluding his promotion to the second year. Its letter to Bulwer identified problems with (1) “analyzing] clinical data in complex cases”; (2) “interpersonal and communication skills”; and (3) “gain[ing] insight into feedback.” The signatories were Flint, residency program director, and Riccardo Wellisch, chair of the CCC.
3. MAH’s due process proceedings. As a result of the CCC’s decision of nonrenewal, MAH, in accordance with its written policy,[4] convened an ad hoc appeal committee (AHC) to review the CCC’s conclusion. The AHC consisted of four physicians: the chairs of the departments of medicine and radiology; the director of the training program for radiology; and, in this instance, the director of medical education, Dr. Charles Hatem, who served as chair of the AHC. The AHC process sought to assure sanctioned residents a fair hearing, including the right to attend and the opportunity to present evidence and argument.
The AHC met three times. Bulwer attended the first meeting, on April 24, 2006. Flint submitted the evaluators’ concerns about Bulwer’s deficiencies in the three core competencies and offered *343 examples of errors in patient care from three charts. Bulwer disputed the deficiencies alleged by the evaluators and Flint. He did not express any feelings of discrimination. Three days after the meeting, he submitted a fourteen-page letter responding specifically to alleged patient care errors and the core competency concerns. The letter contained no complaint of discriminatory treatment.
At the conclusion of the first meeting, the AHC began deliberations and decided that it “need[ed] more data” and communications with other physicians to make sure that it had exercised “due diligence and due process.” Chairman Hatem was especially concerned that, as a means of thoroughness and fairness, the AHC receive information from rotation supervisors directly familiar with Bulwer’s performance.
At a second meeting on May 1, 2006, the AHC interviewed Balestrero; two senior evaluators from the MICU (Thompson and Dr. Robert Westlake); Dr. Gary Setnik, chair of the department of emergency medicine; and Wellisch. Balestrero, Westlake, Thomson, and Wellisch regarded Bulwer as still deficient in the competencies specified by the CCC. Thomson, Westlake, and Well-isch viewed Bulwer as “dangerous” to patient safety. Setnik judged him to be “better than average” and free of any “specific shortcoming need[ing] drastic attention.”
The AHC devoted its third meeting on May 9, 2006, exclusively to deliberation. It reviewed all submitted materials, weighed the satisfactory emergency department and cardiology rotations against the criticized work in the intensive care units and on wards, and ultimately concluded that Bulwer’s performance of the residency had been substandard. The four AHC members voted unanimously to support the CCC decision of nonrenewal of his MRA after the first year.
On May 17,2006, Flint and Dr. Stephen Zinner, the chair of the department of medicine, met with Bulwer. They informed him that MAH would not offer him further training. By separate letters of that date, Flint and Zinner formally reported the AHC decision to Bulwer. On the same day, Zinner wrote a “memo to file,” summarizing the decision and its grounds, including concern for patient safety. The memorandum included the following passage:
“I also informed Dr. Bulwer that in the three week period during which the appeal was reviewed, I had received several *344 communications from attending physicians that pointed out that Dr. Bulwer had demonstrated additional clinical errors, failures to document or comply with our clearly stated expectations about chart notes, and failures to call for appropriate help with severely ill patients. In addition I told him I recently was made aware of a review by the Department of Quality and Safety at Mount Auburn Hospital of a patient under his care last January whose death might be attributable to an error made by Dr. Bulwer.”
The memorandum stated that Flint had decided to terminate Bulwer immediately rather than to permit him to finish the remaining months of his MRA; it stated also that Zinner supported that decision.[5]
Bulwer immediately appealed from the AHC’s decision to the president and chief executive officer of MAH, Jeanette Clough.[6] On June 5, 2006, Clough forwarded a letter of notice to Bulwer that she would convene a committee to review the AHC’s decision. Despite three attempted deliveries by the post office, Bulwer did not claim the letter.[7] In June, in accordance with the hospital’s statutory obligation,[8] Flint advised the Board of Registration in Medicine that MAH had terminated Bulwer from the residency program. In July of 2006, Bulwer received Clough’s letter, but pursued no further process at MAH.
Analysis. 1. Discrimination, a. Absence of disparate impact claim. Neither in the Superior Court nor on appeal has Bulwer presented or argued a claim of discrimination by reason of disparate impact. As the majority acknowledges, the summary judgment record shows that over the six years from 2000 through 2006, approximately 252 residents matriculated at MAH; that three of them failed to complete the program; and that two of the three were of African descent and one Caucasian. From these numbers the majority submits, “It is for the jury to decide whether *345 the fact that two-thirds of the terminated residents are of African descent is a pattern from which discriminatory animus can be inferred in the termination of Bulwer.”[9] Ante at 332.
No authority supports this remarkable proposition. “Discrimination that is based on proof of disparate impact ‘involve[s] employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another.’ ” Lopez v. Commonwealth, 463 Mass. 696, 709 (2012), quoting from School Comm, of Braintree v. Massachusetts Commn. Against Discrimination, 377 Mass. 424, 429 (1979). See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987-988 (1988). Here Bulwer has not identified a suspect employment practice by MAH. Nor has he proposed that three terminations out of the 252 residencies provide a statistical sample sufficient to qualify as evidence in support of any inference. See Fudge v. Providence Fire Dept., 766 F.2d 650, 657-659 (1st Cir. 1985) (African-American plaintiff failed to prove disparate impact claim under Title VII where written examination for hiring in fire department resulted in admission of four percent of black applicants as compared to thirteen percent of white applicants because [1] sample size constituted “narrow data base” [only twenty-four of 248 applicants were black], [2] results lacked statistical significance, and [3] results could have occurred by chance). See also 2 Larson, Employment Discrimination § 22.05 (2d ed. 2014) (requiring adequate sample size to permit inference of statistical significance and disparity). The majority’s reference to the minute incidence of residency failure cannot manufacture a triable issue of disparate impact or disparate treatment.
2. Standard of review. We study de nova the same record as the motion judge. See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 123 n.l (1997); Chai-Sang Poon v. Massachusetts Inst, of Tech., 74 Mass. App. Ct. 185, 194 (2009). The major *346 ity invokes the guidance that questions of intent or motivation are usually unsuitable for disposition of summary judgment. However, the applicable standard of review has moved far beyond that generality. Otherwise, a conclusory assertion of intent or motive will immunize itself from inspection and force the conduct of an unwarranted trial. The developed refinements of the standard of review call for examination of the summary judgment record in the light most favorable to the nonmoving or opposing party (Bulwer) and ask whether the record resolves the material questions of fact and issues of law in favor of the moving parties. The “most favorable” light is comprehensive; it falls upon evidence submitted by both a complaining employee and a responding employer. See Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 37 (2005) (weighing possible deficits in employee’s “responsiveness to clients,” “collegiality,” and “human relations skills”); Chai-Sang Poon v. Massachusetts Inst, of Tech., supra at 196-199 (assessing history of friction with students, staff, and colleagues).[10]
In cases of alleged employment discrimination, intent, motivation, and credibility will typically come into dispute. Massachusetts precedents have consistently concluded that a defendant employer is entitled to summary judgment against an accusation of discrimination if the employer demonstrates that the employee’s “evidence of intent, motive, or state of mind is insufficient to support a judgment in the plaintiff’s favor.” Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 440 (1995). See, e.g., Matthews v. Ocean Spray Cranberries, Inc., 426 Mass, at 127; Sullivan v. Liberty Mut. Ins. Co., 444 Mass, at 39-40 (affirming summary judgment against allegation of discriminatory motive); Tardanico v. Aetna Life & Cas. Co., 41 Mass. App. Ct. 443, 447-450 (1996) (same); Romero v. UHS of Westwood Pembroke, Inc., 72 Mass. App. Ct. 539, 545-548 (2008) (same); Chai-Sang Poon v. Massachusetts Inst, of Tech., 74 Mass. App. Ct. at 196-199 (same).
c. Discriminatory treatment claim, i. Summary judgment standards. Under G. L. c. 151B, § 4(1), to establish liability for racially motivated employment discrimination, Bulwer must prove each of four prima facie elements: “membership in a *347 protected class, harm, discriminatory animus, and causation.” Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001). Sullivan v. Liberty Mut. Ins. Co., 444 Mass, at 39. If the evidence shows the plaintiff to have “no reasonable expectation” of proof of a prima facie element, the defendant is entitled to summary judgment. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
In the typical setting of only circumstantial information, the case at trial would proceed through the three burden-shifting stages established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and Wheelock College v. Massachusetts Commn. Against Discrimination, 371 Mass. 130,138-139 (1976). Bulwer must offer prima facie evidence of discrimination, a light burden which I shall assume to have been carried. See Sullivan v. Liberty Mut. Ins. Co., 444 Mass, at 40. Then MAH must offer a legitimate nondiscriminatory ground for its action and produce credible supporting evidence, as accomplished here by the account of unsatisfactory performance. See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 117 (2000), and cases cited. Third, and often decisively for the purpose of summary judgment, the burden returns to Bulwer to prove that MAH’s reason for termination constituted a pretext concealing a discriminatory purpose. See, e.g., Matthews v. Ocean Spray Cranberries, Inc., 426 Mass, at 128.
The majority incorrectly states that at the stage of summary judgment “the issue is whether the hospital met its burden of establishing that there is no genuine issue of fact concerning pretext” (emphasis supplied). Ante at 330. Where, as here, the first two stages of the burden-shifting framework are not in dispute, the question on summary judgment reduces to whether “the plaintiff introduced sufficient material to demonstrate that there is a genuine issue of material fact whether the defendant’s proffered reason is a pretext; that is, ‘[djoes the employer’s articulated reason lack[ ] reasonable support in evidence or is [it] wholly disbelievable[?]’ ” (emphasis supplied). Brooks v. Peabody & Arnold, LLP, 71 Mass. App. Ct. 46, 52 (2008), quoting from Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 765 (1986) (affirming summary judgment for defendant). Accord Brunner v. Stone & Webster Engr. Corp., 413 Mass. 698, 699-700, 703-705 (1992) (affirming summary judgment for defendant); Tardanico v. Aetna Life & Cas. Co., 41 Mass. App. Ct. at 448 (affirming summary judgment for defendant); Chai- *348 Sang Poon v. Massachusetts Inst, of Tech., 74 Mass. App. Ct. at 196-197 (affirming summary judgment for defendant). In the summary judgment process, the defendant does not acquire an additional burden of disproving pretext (i.e., proving a negative); rather, the plaintiff must substantiate a genuine issue of its presence. See Wheelock College v. Massachusetts Commn. Against Discrimination, 371 Mass, at 138-139. The plaintiff may not rest “merely upon conclusory allegations, improbable inferences, and unsupported speculation.” Brooks v. Peabody & Arnold, LLP, supra at 56, quoting from Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Indeed, “if the evidence is in balance, the employer must prevail.” Trustees of Forbes Library v. Labor Relations Commn., 384 Mass. 559, 566 (1981). See Sullivan v. Liberty Mut. Ins. Co., 444 Mass, at 57 (affirming summary judgment for defendant employer because “ample, uncontroverted evidence [showed] that the negative impression [which the employer] had formed of [the employee’s] abilities was a primary reason [the employee] was selected for layoff’).
Finally, it bears emphasis in this instance that the information submitted in support of, and opposition to, summary judgment must have the quality of “facts as would be admissible in evidence” at trial. Mass.R.Civ.P. 56(e), 365 Mass. 824 (1974). As we will specify, the information offered by Bulwer in support of pretextual conduct by MAH falls well below the threshold of admissible evidence.
ii. Proffered information. The majority relies upon four categories of information as evidence of pretext: (i) MAH’s treatment of other residents or physicians; (ii) the words or conduct of supervisors during Bulwer’s rotations or due process review; (iii) the representations of Dr. Romana Dvorak; and (iv) the allegedly “shifting explanations” provided by MAH to the Board of Registration in Medicine for termination of Bulwer’s residency. None withstands analysis.
(A) Treatment of comparable individuals. “The most probative means of establishing that the plaintiff’s termination was a pretext for racial discrimination is to demonstrate that similarly situated white employees were treated differently.” Matthews v. Ocean Spray Cranberries, Inc., 426 Mass, at 129, citing Smith College v. Massachusetts Commn. Against Discrimination, 376 Mass. 221, 228 (1978).
The majority contends that “Bulwer was not given the same remediation opportunities as other first-year residents who strug *349 gled in the program,” ante at 331; that two of the three members terminated from the residency program since 2000 were “of African descent,” ante at 332; and that another “intern of African descent did not continue in the program,” ibid. However, the majority does not acknowledge that the record tells us nothing about those terminated residents: neither their identities, nor their qualifications and performances, nor the reasons for their departures, nor their remedial opportunities.[11]
In Matthews v. Ocean Spray Cranberries, Inc., 426 Mass, at 130, quoting from Smith v. Stratus Computer, Inc., 40 F.3d 11,17 (1st Cir. 1994), cert, denied, 514 U.S. 1108 (1995), the court explained that, to establish pretext by demonstrating differential treatment of similarly situated persons, a plaintiff must identify comparators “in terms of performance, qualifications and conduct, ‘without such differentiating or mitigating circumstances that would distinguish’ their situations.” The court has since held that the comparators’ circumstances must be “substantially similar to those of the complainant ‘in all relevant aspects’ concerning the adverse employment decision.” Trustees of Health & Hosps. of Boston, Inc. v. Massachusetts Commn. Against Discrimination, 449 Mass. 675, 682 (2007), quoting from Matthews v. Ocean Spray Cranberries, Inc., supra at 129. “The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.” Ibid., quoting from Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989). A “plaintiff does not carry his burden of demonstrating pretext on a motion for summary judgment where he provides merely ‘sketchy evidence lacking a sufficient foundation for a legally relevant comparison’ of allegedly similarly situated employees.” Matthews v. Ocean Spray Cranberries, Inc., supra at 131 n.6, quoting from Smith v. Stratus Computer, Inc., 40 F.3d at 17.[12]
*350 (B) Conduct and words of supervisory physicians. The majority proposes that the conduct or words of multiple MAH physicians permit a reasonable inference of unfair treatment and therefore pretext masking racial animus. In the view of the majority, these deeds and words included (1) criticism of emergency department physicians by MICU physicians as a result of the emergency department’s favorable evaluation of Bulwer, ante at 331; (2) the failure of Flint to “follow up” with physicians engaged in unfair criticism of Bulwer, ibid.; (3) the failure of Balestrero to hold weekly meetings with Bulwer after December 1, 2005, ibid.; (4) open criticism of Bulwer by Bial, ibid.; (5) an impliedly critical comment by CCC chair Wellisch, ante at note 11; (6) the imposition of termination rather than nonrenewal, ante at 333; and (7) alleged irregularities in the AHC process, ante at 332-333.
The most obvious characteristic of this body of behavior is its professional, not racial, nature. The majority’s insinuation of racial, rather than medical, motivation constitutes guesswork rather than reasonable inference. None of these events indicates that the actors dealt with race or made less than a good faith *351 judgment about Bulwer’s professional performance. See Brunner v. Stone & Webster Engr. Corp., 413 Mass, at 703-704, and cases cited (lack of evidence contradicting good faith evaluation of employee’s performance permits summary judgment for employer). Indeed the record reflects the efforts of individual physicians to assist Bulwer’s residency. Flint accommodated Bulwer’s late entry into the program.[13] Balestrero testified that she both met and attempted to meet with Bulwer. Bial acknowledged that she confronted him on multiple occasions to address the quality of his work. The one such instance cited by the majority occurred in a small room outside the presence of patients and in the presence of one other resident. No evidence supports the imputation that she “harbored” a separate personal racial animosity toward him. Wellisch’s comment that a resident’s duty is to furnish information to senior physicians related to medicine and not race. MAH’s written due process policy specifically authorized termination of a residency, rather than mere nonrenewal by the AHC, “in cases where patient safety and well-being may be in jeopardy as determined by the Chair of the Department [of Medicine].” Here, that chair, Zinner, served as a member of the AHC and made such a determination.
The majority’s imputation of pretext or animus to these multiple, separate professional judgments is unsupported and unsupportable. See Wooster v. Abdow Corp., 46 Mass. App. Ct. 665, *352 672 (1999) (affirming summary judgment for defendant on age discrimination claim where “there [were] no remarks concerning age and no apparent connection between the evaluations and the plaintiff’s age”); Bruce v. Wellesley, 47 Mass. App. Ct. 800, 806 (1999) (remanding case to Superior Court for entry of judgment notwithstanding verdict because “[ojther than the undisputed fact that the plaintiff was over age forty at the time he was discharged, there was no showing that the town was concerned about the plaintiff’s age” when it denied him tenure as teacher at high school).
The case law requires invidious motive, not perfect evaluation, by the employer. Sullivan v. Liberty Mut. Ins. Co., 444 Mass, at 56. “The employer’s reasons [for adverse action] need not be wise, so long as they are not discriminatory and they are not pretext.” Tardanico v. Aetna Life & Cas. Co., 41 Mass. App. Ct. at 448. “[N]ot every unfair termination . . . constitutes unlawful employment discrimination .... Membership in a protected class without more is insufficient to make the difference.” Weber v. Community Teamwork, Inc., 434 Mass. 761, 778 (2001). See Wooster v. Abdow Corp., 46 Mass. App. Ct. at 673 (same). In this case, Bulwer has offered only membership in a protected group, and nothing more.[14]
(C) Dr. Ramona Dvorak. Dvorak furnished deposition testimony in support of Bulwer. She had worked at MAH from 1997 until 2005. During her last six years she had served as the director of consultation psychiatry, until MAH eliminated that position. She observed Bulwer on approximately twenty occasions, and viewed him as a “talented and outstanding clinician.” Dvorak had submitted a letter to the AHC in support of him. She could not recall any specific interactions with him.
Dvorak testified that “in my opinion, there is institutional racism at Mount Auburn Hospital.” She was aware of only “one other black physician that remained on staff. . . besides myself’; *353 but she was not aware of the hospital-wide diversity statistics during her employment.
Dvorak based her opinion of institutional racism on three grounds: (1) incidents of conduct by unidentified persons within the MAH buildings; (2) the administration’s tolerance of several mediocre white physicians on staff; and (3) elimination of her position.
As to incidents, at unspecified times, unknown individuals had twice removed from her office door a diversity bumper sticker and had once left a piece of white supremacist literature in a staff room.
As to personnel, Dvorak cited three occurrences of preferential treatment of white staff physicians. In one instance, MAH had retained on staff a male psychiatrist whose clinical judgment she had criticized repeatedly over a five-year period. As a second, she cited the elimination of her own position by MAH in 2006 as racially motivated retaliation against her role as an outspoken black female insistent upon clinical excellence.[15] She did not specify any incident or personnel involved in that action. As a third instance, she referred to MAH’s retention of a physician whom she suspected as a white supremacist. When MAH counsel asked for the basis of her suspicion, she responded that the physician had maintained a large American flag on his office wall.[16]
None of Dvorak’s commentary qualifies as admissible evidence. It is inadmissible, not on technical bases, but rather on multiple independently adequate grounds of lack of foundation, lack of relevance, and overriding prejudice.
As to foundation, she conceded that she had no knowledge of the medical merits of Bulwer’s case in the CCC and AHC:
Counsel for the hospital: “But you will agree with me, you don’t know the circumstances [of Bulwer’s case in the CCC and AHC].”
A.: “I do not know the circumstances.”
*354 Q.: “But you believe it [racial bias by MAH] genetically; you don’t know the specifics of their concerns [about Bulwer’s performance], right?”
A.: “I do not know the specifics of their concerns, that is correct.”
As to relevance, she could not identify the perpetrators, the time, or the circumstances of the events in MAH buildings, nor connect them in any respect to the case of Bulwer. Nor did the retention of the allegedly mediocre white male psychiatrist have any linkage to this dispute. Her criticism of unidentified passive MAH administrators had no bearing on the decision terminating Bulwer’s residency. See Brunner v. Stone & Webster Engr. Corp., 413 Mass, at 704, quoting from Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d at 10 (“The biases of one who neither makes nor influences the challenged personnel decisions are not probative in an employment discrimination case”); Weber v. Community Teamwork, Inc., 434 Mass, at 111 (employee could not establish discrimination based on events and conditions that predated decisionmaker’s arrival at employer because no evidence that previous discriminatory attitude influenced decision-maker). See also Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007), quoting from Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007) (“[T]he discriminatory intent of which [an employee] complains must be traceable to the person or person who made the decision to fire him. . . . When assessing a claim of pretext in an employment discrimination case, an inquiring court must focus on the motivations and perceptions of the actual decisionmaker”).
Finally, Dvorak’s broadsided “opinion” of MAH, her former employer, as a “racist” institution is blatantly inflammatory and prejudicial. See Pina v. The Children’s Place, 740 F.3d 785, 795 (1st Cir. 2014), quoting from Caban Hernandez v. Philip Morris, USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) (“Although we will draw all reasonable inferences in the nonmovant’s favor, we will not ‘draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective’ ”). These offerings do not present questions of credibility or weight for a jury, but only a question of law for a judge. Dvorak’s deposition testimony is an attempt to substitute a grudge for evidence. As a *355 matter of law, it is inadmissible in toto.[17]
(D) Shifting explanations. Finally, the majority’s description of MAH’s statements of reasons for nonrenewal of the residency (“poor performance in the internal medicine department”) and for termination as reported to the Board of Registration in Medicine (“[fjailure to make appropriate progress in processing and applying evaluations and other constructive criticism and feedback to patient care responsibilities”) as potentially shifting and suggestive of pretext is untenable. As the survey of rotation evaluations and committee findings demonstrates, those expressions convey a consistent assessment of the grounds for unsatisfactory performance. The indicator of shifting explanations requires a significant inconsistency or apparent falsehood. See, e.g., Waite v. Goal Sys. Inti, Inc., 55 Mass. App. Ct. 700, 705 (2002).
iii. Discrimination summary. In sum, eight rotational evaluators independently identified common and continuing shortcomings. The program director, Bulwer’s adviser, and the thirteen-member CCC concurred in those evaluations. The AHC of four senior physicians, after an expanded review, concluded that the deficiencies remained serious. The chair of the department of medicine concluded that the deficits risked patient safety.[18] The entire work of the physicians and committees is devoid of any reference to race or national origin. The minutes of the AHC’s meetings reflect a special concern about the consequences of the proceeding for Bulwer’s career.
Against this body of evidence, Bulwer and the majority have not identified disparate treatment of any similarly situated individual. The record is devoid of comparators and devoid of any direct or circumstantial evidence of racial motivation by any participating MAH decisionmaker. The summary judgment record presents a case in which evidence of invidious intent is not merely insufficient, but rather nonexistent.
Perhaps most troubling is the majority’s treatment of medical judgment. It purports to see beneath the accumulated layers of *356 professional opinion some evidentiary clues of invidious behavior warranting a jury trial (e.g., failure of Flint and Balestrero to meet more frequently with Bulwer amid their duties; criticism of Bulwer’s performance by Bial; comment about a resident’s duties by Wellisch). Nothing in the record supports the characterization of these events as evidence of discrimination rather than the practice of medicine in a large teaching hospital. The majority’s rationale is strangely skeptical of contemporaneous documented medical judgment, and even more strangely indulgent of hypothetical conspiracy theories.[19] Its entire discrimination analysis is an exercise in conjecture, not evidence. The record permits no reasonable expectation of proof of racially discriminatory conduct or pretext for such conduct.
2. Breach of contract claim. The majority believes that several claims of breach of the residency contract by MAH deserve a trial: (1) the failure to provide a nondiscriminatory workplace; (2) failure to provide Bulwer with required resources and supervision; (3) failure to provide him with adequate notice of specific patients or allegations considered by the AHC; and (4) omission of a resident from membership in the AHC. Ante at 334. For the following reasons, no triable issue of a material breach is present.
The claim of a discriminatory workplace depends entirely upon allegations of discrimination already discussed. That claim does not have the support of evidence creating a genuine issue of material fact.
Similarly, the alleged failure to furnish Bulwer with required resources and supervision lacks any basis in the record. This claim appears to rest upon the allegation that Flint and Balestrero failed to provide sufficient remedial support to Bulwer after delivery of his October, 2005, evaluations and his November conferences with them. The only specification of that claim is that Balestrero did not meet with him on a weekly basis in December, a problem which she attributed to his scheduling. That component was only one of six elements of the December 1, 2005, remediation plan composed by the CCC. No evidence indicates that the remaining five elements did not go into effect for Bulwer’s benefit (review of all his notes by a senior resident; monitoring of his case presentations by attending physicians; consultations by *357 the CCC with his nurse managers; review of his December rotation by the CCC; discussion of his December evaluations and general standing by a CCC representative, Balestrero, and Bulwer). Bulwer’s December, 2005, and January, 2006, evaluations appeared better, but his February, 2006, assessment plummeted.
At the first meeting of the AHC, Flint presented the reasons for nonrenewal: problems in the three core competencies and three illustrative cases from patient charts. Bulwer responded to the three competency concerns, requested and received permission to file responsive written material, and three days later submitted a fourteen-page reply with specific references to four patient charts and five admissions and progress notes. It is uncertain whether Bulwer received notice of the three illustrative cases first submitted by Flint. The AHC’s provision of a full written rebuttal process cured any deviations from the notice requirement.
The AHC did not breach any contractual standard by the conduct of its second and third meetings. The contractual due process provision calls for the introduction of original evidence in the presence of the resident. Then, “[i]n reaching its findings and recommendations, the [AHC] may meet with other persons and examine records” (emphasis supplied). The AHC followed that process as part of its deliberations here, as it invited to the second meeting the views of the additional physicians through whose departments Bulwer had rotated. The third meeting consisted entirely of deliberative discussion. Those proceedings were not unauthorized or secretive events, as persistently suggested by the majority opinion. Contractual due process did not entitle Bulwer to attend the second and third deliberative sessions. The AHC had begun deliberation at the close of the first session and then pursued it to completion.
Finally, the AHC did omit a resident or “house officer” from its membership. Throughout the proceedings all participants appear to have been unaware of that contractual specification.[20] The four members of the AHC eventually reached a unanimous decision. The question remains whether the omission constituted a material breach harmful to Bulwer. In these circumstances, it did not.
“In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the *358 benefit which he reasonably expected; . . . [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.” Restatement (Second) of Contracts § 241 (1981).
Here, the procedural deviation did not deprive Bulwer of a reasonably expected benefit (a different outcome). Nor did MAH depart from standards of good faith and fair dealing. The absence of a resident was an oversight, and not an evasion. The minutes of the AHC hearings show abundant concern for a fair determination and for Bulwer’s career. The weight of information and the train of MAH procedures leading to the outcome left no room for a different result.
Conclusion. The duty of a judge is to resolve a case on the basis of the presence or absence of evidence and the governing legal standards, not on the basis of speculation or preconception. The Superior Court judge performed that duty fully and accurately. I would affirm her entry of summary judgment in its entirety.

The grading scale extended from numerals 1 (lowest rating) through 5 (highest). Grades 1 and 2 signified a need for improvement; 3 was “satisfactory”; and 4 and 5 reflected “superior” performance.

One evaluator gave him an “overall” rating of “below average.” As a narrative summary, the evaluator commented, “Very good knowledge of cardiac issues. Major deficiencies in other areas of medicine. Not ready to be a PGYII [second year resident].”

The plan included weekly meetings between Bulwer and Balestrero. The majority notes that “[tjhose meetings did not occur.” Ante at 323. Balestrero’s deposition testimony is that she tried unsuccessfully to schedule time with Bulwer.

The hospital codified its procedure for residency sanctions in a formal document entitled “Houseofficer Evaluation/Grievance/Due Process Policy,” approved by its medical education committee (due process policy).

In accordance with MAH’s due process policy, only the chair of the department of medicine, Zinner, could terminate a resident for concerns of patient safety.

MAH’s due process policy required Bulwer to appeal from the AHC’s decision to the president of the medical staff, who was not Clough.

Bulwer testified in his deposition that he could not receive the letter because he was hospitalized for temporary blindness, a condition which he alleged the defendants’ conduct to have triggered.

General Laws c. 112, §§ 5B and 5F, require a hospital to report a termination of a registrant’s privileges for cause to the Board of Registration in Medicine.

By footnote, the majority continues: “This is not statistical evidence. ... It is nonetheless evidence of the racial composition of the residents who have historically been terminated from the hospital’s residency program. On summary judgment, we are not entitled to disregard it. If the case proceeds to trial — as it should — the hospital will have an opportunity to rebut the inference that can be drawn from this evidence by introducing additional information concerning the composition of the program and those who have been terminated from it.” Ante at note 13. This reasoning reduces to the notion that, although Bulwer is not pursuing a disparate impact claim, he should receive the benefit of inadequate evidence of such a claim.

In particular, the majority avoids the obligation to consider countervailing evidence, ante at 318 (addressing “summary judgment record”), and consequently offers a one-sided synopsis of the record without explanation of the performance of Bulwer as concededly “short of expectations.” Ante at 331.

The other residents experiencing difficulty, but maintained in the program in recent years, were two international medical graduates who “struggled” with MAH’s computer system (and one with a language barrier). MAH permitted them to repeat rotations.

The majority states that “[i]t is for the jury to decide whether the fact that two-thirds of the terminated residents are of African descent is a pattern from which discriminatory animus can be inferred in the termination of Bulwer.” Ante at 332. In an accompanying footnote, the majority also faults MAH for not *350 “introducing additional evidence concerning the composition of the program and those who have been terminated from it.” Ante at note 13.1 disagree on both points.
First, as discussed previously, the relevant legal question is whether Bulwer has introduced sufficient evidence to demonstrate a genuine issue of material fact as to pretext. MAH has no third-stage summary judgment obligation to introduce evidence to prove the absence of pretext.
Second, even if three cases out of 252 could somehow create a “pattern,” the evidence of the dismissed residents is relatively meaningless because we know nothing about the reasons for their dismissals. See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass, at 130 n.4 (“The plaintiff also asserts that the defendant has exhibited discriminatory intent in that it does not employ African-American managers or supervisors. However, he has not supported this assertion, as he must in order to meet the burden of establishing pretext, with evidence concerning whether any African-Americans ever applied for such positions, and, if so, evidence concerning their qualifications. Thus, the plaintiff’s assertions do not assist his pretext claim”); Sullivan v. Liberty Mut. Ins. Co., 444 Mass, at 54-56 & n.36 (statistical evidence had “limited probative value” in proving pretext because it failed “to eliminate other explanations for the disproportionate statistics, such as random chance [given the small discrepancies and sample size involved here] or the actual distribution of aptitudes or expertise among [employees] . . . both before and after the [employment decision]”); Boston v. Massachusetts Commn. Against Discrimination, 39 Mass. App. Ct., 234, 243 (1995) (evidence of discharged employees is “not very instructive” without knowledge of “the reasons underlying those discharges”).

In deposition testimony, Bulwer effectively acknowledged his unawareness of any evidence of animus from Flint.
Q.: “When he accepted you into the program out of the normal rotation, you didn’t believe at that time that he was discriminatory —”
A.: “Loved — loved him to bits.”
Q.\ “Okay. At this point in time in April],] 2006[,] did you believe he was discriminatory against you?”
A.: “By virtue of him siding with people who were supremacist [with] their language and said and did what they did, then I had to lump them all in one basket.”
Q.: “So you believe Dr. Flint acted with a discriminatory animus towards you?”
A.: “Yes.”
To this concession, one could add the improbability that Flint’s professional receptiveness would transform into discriminatory rejection in the course of eight months. See Dziamba v. Warner & Stackpole LLP, 56 Mass. App. Ct. 397, 406 (2002), and cases cited (“[I]t is improbable that the same persons who hire or promote someone already in a [protected group] will suddenly develop an aversion to [that group]”).

The majority points out that Bulwer received some favorable rotation evaluations. Ante at 331. However the favorable reviews do not permit a reasonable inference that MAH’s reliance on the unfavorable assessments was false. See Lipchitz v. Raytheon Co., 434 Mass, at 502, 507; Knight v. Avon Prod., Inc., 438 Mass. 413, 421-422 (2003); Waite v. Goal Sys. Inti, Inc., 55 Mass. App. Ct. 700, 705 (2002). The work in question is the practice of medicine. The majority acknowledges, as it must, the “certainly ample evidence that Bulwer’s performance in the residency program fell short of expectations.” Ante at 331. MAH was fully entitled to conclude that a mixed performance was an unsatisfactory performance, especially for patients located in the wrong part of the mix.

She believed that MAH had eliminated her position because “they really felt that they wanted someone else in the [reconfigured] position who could get along better with the people throughout the hospital.” She viewed that reason as “completely absurd” and “the only explanation” for the elimination of her position to be “racism.”

Dvorak testified, “[W]hite supremacists frequently have huge American flags as that denotes their, you know, white America mentality.”

The motion judge correctly rejected Dvorak’s deposition testimony as “bare assertions, understandings, beliefs or assumptions,” with citation to Key Capital v. M&S Liquidating Corp., 27 Mass. App. Ct. 721, 728 (1989).

The physicians and the AHC recognized that Bulwer had received a number of mixed and favorable rotation evaluations and that his described weaknesses lay in three of the six core competencies, and not all six. The gravamen of concern was his persistence in those three deficiencies and his treatment of constructive criticism with obdurate resentment.

The gist of the deposition testimony of both Bulwer and Dvorak was that white supremacists had infiltrated the decision-making positions of a major university teaching hospital.

The written AHC process does not call for the participation of attorneys.